**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 10, 2014**

# In the Court of Appeals of Georgia

A13A1911. FRANKLIN v. THE STATE.

PHIPPS, Chief Judge.

A police search of the residence where Jerome Franklin lived with his girlfriend yielded a substantial[1] amount of marijuana and related paraphernalia. Franklin was not at home when the search was conducted, but was indicted (along with the three men who were at the residence when the police arrived) for possession of more than one ounce of marijuana and possession of marijuana with intent to distribute.[2] Franklin was tried alone, and the jury found him guilty as charged. After

---

[1] An expert in the field of chemical analysis of narcotics testified to having tested approximately 175 grams of the "green leafy material" seized, and that the material tested was marijuana.

[2] See OCGA §§ 16-13-2 (b) (providing for misdemeanor punishment for "possession of marijuana, which possession is of one ounce or less"); 16-13-30 (j) (1) ("It shall be unlawful for any person to possess, have under his or her control,

merging the two counts, the trial court sentenced Franklin for possession of marijuana with intent to distribute. In this appeal, Franklin challenges the sufficiency of the evidence. We affirm.

Where an appellant challenges the sufficiency of the evidence "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[3] So viewed, the evidence showed the following.

The residence in question fell within the ambit of a drug investigation after police received citizen complaints about activities occurring upon the premises. A police officer specially trained in drug dealing initiated surveillance. The officer, qualified at trial as an expert in drug investigation and operations, described observations that indicated to him sales of narcotics: "[P]eople from inside the residence came out to the front curtilage and street of the residence and met with cars, made a quick hand-to-hand exchange, then the person went back into the house. And the person and the people in the vehicle left." Thus, the officer set up a controlled

manufacture, deliver, distribute, dispense, administer, purchase, sell, or possess with intent to distribute marijuana.").

[3] *Jackson v. Virginia*, 443 U. S. 307, 319 (III ) (B) (99 SCt 2781, 61 LEd2d 560) (1979) (emphasis in original).

drug buy. He sent an undercover investigator to the residence, where the investigator purchased a small quantity of marijuana from an individual at the home. Thereafter, the officer procured a warrant authorizing the police to search the residence for marijuana and related objects.

On December 5, 2011, the warrant was executed. When the team of law enforcement officers arrived at the residence, two men were sitting in the garage with its door open; the men raced into the house, closing the garage door. Discerning that their approach had thus been compromised, the officers abruptly breached the front door and entered the residence in an effort to secure the premises.

A strong odor of unburned marijuana permeated the house. The two men who had fled the garage – identified later as Michael Heads and Okeem Forde – were found hiding, together with a third man, in an upstairs bedroom closet. These three men would later become Franklin's co-indictees.

With the occupants collected and being held in a single room, officers began searching the premises for marijuana and related objects. As explained by the expert narcotics officer at trial, objects that typically indicated that marijuana was being sold included "baggies of various sizes, colors, markings . . . used for street level and mid level distribution"; digital scales in various sizes, which were commonly used in the

sale of narcotics; large quantities of U. S. currency; and guns and other weapons for protection against the police and robbers. The evidence seized in this case was discovered primarily in the garage and in several bedrooms, and included the following.

In the garage, police found on a chair a large plastic bag that contained 5.84 grams of marijuana. Inside a container with the label "Nutter Butter," police found approximately 22 small plastic bags, each of which held between 0.3 and 0.5 grams of marijuana. A locked safe located in the garage was found to contain four bags of marijuana, which bags weighed a total of approximately 80 grams. Atop the safe was a digital scale with marijuana residue on its weighing surface. Inside a toolbox was a handgun. A second handgun was located "at the scene."

In an upstairs bedroom, delineated at trial as "the last bedroom on the right, which was painted pink," a large digital scale was atop a desk. Inside the desk drawer were two small digital scales. In that bedroom, police found a baggie of marijuana, weighing 0.89 gram. Also in that bedroom, police found four bags; the contents of three tested positive as marijuana and weighed 26.80 grams, 28.19 grams, and 13.67 grams. The fourth bag contained 3.98 grams of green leafy material, which was not

tested.[4] In that bedroom, police also found various items bearing Franklin's name – pieces of mail, traffic citations, and a pill bottle that contained a small amount of marijuana. And police discovered inside a shoe box on the floor $1,103 in U. S. currency.

In another bedroom, delineated at trial as "the front left bedroom," police discovered $1,000 in U. S. currency wadded up in a shoe.

In a third bedroom, delineated at trial as the "master bedroom," which was "the first bedroom on the right when you came up the stairs," police found inside a jewelry box a small plastic bag containing marijuana. Inside a night stand in that room was a large plastic bag containing several small plastic bags of marijuana, weighing a total of 6.7 grams; the small plastic bags were of the same type (of small bag) as those discovered throughout the residence. Atop a shelf in the master bedroom closet, police found a small plastic bag of marijuana; and on the closet floor, police found a small plastic bag of marijuana. It had been in this closet that the three men were discovered hiding.

---

[4] The expert in the field of chemical analysis of narcotics testified that the entirety of the "green leafy material" collected as evidence was not tested because "we're looking for weight to the highest charge, as far as 28.35 grams, which we consider a felony. Once you reach that amount and you have multiple bags, you can stop at that point."

The expert narcotics officer recounted at trial that, when Franklin was thereafter taken into custody, he gave a statement to police. Franklin admitted that the marijuana found in the master bedroom night stand was his. He also admitted, but then abruptly denied, that the safe belonged to him. Franklin disclaimed ownership of the cash, guns, and all other marijuana found at the residence (including that found in the safe). Franklin also denied selling marijuana. The state played for the jury an audio-video recording of Franklin's police interview.

On cross-examination of the expert narcotics officer, Franklin elicited testimony that one of the men extracted from the master bedroom closet had claimed ownership of the two small bags of marijuana discovered therein, that his (Franklin's) girlfriend had claimed ownership of the marijuana found in the jewelry box in the master bedroom, and that the aggregate weight of the marijuana seized from the master bedroom was less than one ounce.

Franklin's girlfriend, called as a witness for the state, testified that she owned the residence and that she and Franklin slept in the master bedroom. She testified that, while she believed that the three men found at the house during the search had been selling marijuana, Franklin had not been selling it. She admitted, however, that she and Franklin had shared and smoked marijuana. The state elicited further from

6

Franklin's girlfriend testimony about two of her telephone conversations with Franklin while he was in jail. On December 8, 2011, Franklin said to her that investigators would try to coax the three men found at their home to snitch on one another. Also, Franklin told his girlfriend that one of his co-indictees needed to "take [the charges in this case]." During their telephone conversation on August 11, 2012, which was a few days before the start of his trial, Franklin told his girlfriend to send a postcard to Forde instructing him to claim ownership of marijuana discovered. Franklin had concluded that, because Forde had already resolved his case by pleading guilty, Forde should claim all the drugs and drug paraphernalia. That way, Franklin explained to his girlfriend, he (Franklin) would not have to "take the hit." During this telephone call, Franklin's girlfriend informed him that she had been subpoenaed by the state to testify, and Franklin told her to plead the Fifth. The state played for the jury an audio-recording of their August 11, 2012 conversation.

Co-indictee Heads, testifying under a grant of testimonial immunity, named Franklin as one of the individuals who had sold drugs out of the house. On cross-examination, Franklin elicited Heads's testimony that he frequently visited the residence and was permitted to enter any room at will.

7

Franklin elected not to testify, but called co-indictee Forde to the stand. Forde had been one of the two men who fled the garage when police converged upon the scene, and a small bag of marijuana had been discovered on his person after he was extracted from the closet. By the time Franklin was tried, Forde had entered a guilty plea relating to contraband confiscated during the search and was hence serving a prison sentence. Franklin elicited from Forde testimony that he (Forde) had sometimes spent nights at the residence in question; that he was allowed to enter any room at will; that pursuant to entering a guilty plea, he had admitted ownership of the marijuana found in the "Nutter Butter" container; that he had been selling marijuana out of that residence; that he had not known Franklin to sell or distribute marijuana; and that he had never seen Franklin with more than an ounce of marijuana. Although Forde affirmed on cross-examination that he owned the marijuana found in the "Nutter Butter" container, as well as some of the marijuana found in the pink bedroom, he expressly disclaimed ownership of the marijuana that was found inside the safe.

Franklin contends in this appeal that the evidence was insufficient for the jury to find him guilty of either drug charge (possession of more than one ounce of marijuana and possession of marijuana with the intent to distribute). In particular, he

8

cites evidence that the third man extracted from the master bedroom closet had claimed ownership of the marijuana found in that closet; that Forde had claimed ownership of marijuana found in the pink bedroom, as well as the marijuana found in the "Nutter Butter" container; and that his girlfriend had claimed ownership of the marijuana found in the jewelry box. Franklin asserts that the only marijuana unaccounted for was the marijuana stored in the safe. Franklin acknowledges in his brief that "in response to questions by the police, Defendant admitted owning a safe where approximately 80 grams of marijuana were located," but points out that he disclaimed ownership of that marijuana; further, Franklin cites evidence that when the police converged upon the residence, two men were inside the garage with the safe. Hence, according to Franklin, the state presented no evidence linking ownership of the marijuana inside the safe to him. Moreover, Franklin claims, the state adduced no evidence that "[he] had been observed actually selling any drugs."

Franklin's challenge to the evidence sufficiency thus hinges on what Franklin claims were weaknesses, conflicts or inconsistencies in the state's case.

> But any evidentiary weaknesses, conflicts, or inconsistencies were for the jury to resolve. We do not speculate which evidence the jury chose to believe or disbelieve. Where as here, there was sufficient evidence,

9

even [if] contradicted, to support each fact necessary to make out the state's case, we must uphold the jury's verdict.[5]

Accordingly, Franklin's sole contention on appeal presents no basis for overturning the judgment of conviction.

*Judgment affirmed. Ellington, P. J., and Branch, J., concur.*

---

[5] *Dix v. State*, 307 Ga. App. 684, 686 (1) (705 SE2d 903) (2011) (punctuation and footnote omitted) (rejecting sufficiency challenge to drug convictions based on claimed evidentiary weaknesses or inconsistencies, where evidence presented at trial met standard of *Jackson*, supra); see *Davis v. State*, 287 Ga. App. 478, 481-482 (5) (651 SE2d 750) (2007) (rejecting sufficiency challenge to drug convictions, where arguments raised questions that merely demonstrated questions of fact for the jury); see further *Smith v. State*, 297 Ga. App. 526-528 (677 SE2d 717) (2009); *Heller v. State*, 275 Ga. App. 637-638 (1) (621 SE2d 591) (2005); see also OCGA § 16-2-21 (concerning parties to a crime). The trial transcript reveals that the final charge to the jury included instructions on parties to a crime, joint and sole possession, and actual and constructive possession. Franklin raises no claim of error with respect to the jury charges.